The panel has been reconstituted as panel E+, and we have two cases which will be orally argued. The first one is 2007-1362, Merck v. Apotex. Is it Mr. Bretschblatt? Yes, Your Honor. Whenever you're ready. You're reserved five minutes of your time for rebuttal. Yes, Your Honor. Good morning. Good morning. My name is Robert Bretschblatt, and I represent Apotex in this matter. In this case, we're dealing with an issue of a district court dismissing a counterclaim filed by Apotex against Merck challenging nine Merck patents, two on invalidity, seven on non-infringement. Merck provided Apotex with a covenant not to sue, and based on that, they moved to dismiss after discovery had been taken. Apotex opposed that motion, and Judge Schleet granted it. Judge Schleet was troubled, as well he should be, and he writes it in his opinion at 810, because of the problem caused by Merck's covenant not to sue. And if one looks at Metamune, one finds that, in fact, there is still controversy between Apotex and Merck that the covenant not to sue fails to cure. How would you couch that particular problem? There's two primary issues. One is, based on the fact that Merck sued Apotex, Apotex is still subject to a 30-month stay, which won't end until the first week in August of 2008. Therefore, Apotex, even if other entities go to market, the first to file for a jammer. Well, let me ask you, I'm sorry to interrupt, but I don't mean, we've got two cases here and they're related. There was a 30-month stay that Merck took advantage of here? Correct. Because there's some dispute in at least one of the briefs as to whether or not there is that 30-month stay hold in these circumstances. Statutorily, there is an automatic 30-month stay as long as the brand brings their clause of action within 45 days of receiving the paragraph 4 notice letter. But doesn't that sort of presume that the litigation, that suit, will continue? It has no presumption in the statute, and the FDA has not ruled specifically that simply dismissal of the suit is sufficient. Well, but suppose they file the suit, which triggers the period, and three days later dismissed it. Do you think it's still in effect? The 30-month stay is still in effect. I'm sorry. Go ahead. I was just going to say the FDA has not promulgated a rule that says if the case is simply dismissed, that alleviates the 30-month stay. This case has been dismissed. Apotex is still under the 30-month stay today. Who imposes this stay? It's not the district court. It's under the FDA, right? It's an FDA. It's an administrative stay in that Apotex cannot receive approval, final approval, during the 30 months after a lawsuit is lodged unless there is a court decision finding the patents non-infringed and invalid. But if you're right, it seems to me this, along the way I've suggested, of filing the suit and dismissing it three days later, this is a neat way for the companies to avoid, to get the benefit of this without incurring any of the liabilities. That's exactly right, and that's what's going on. And maybe someone will look at this and say, well, that can't be what the statute means. We don't know. We don't know, do we? Has the agency taken any action on this area to alleviate the 30-month problem? No. But you're not asking us to alleviate the 30-month problem. Well, if the court says so. But you're not asking us to rule on whether or not the 30-month stay is good or bad based on these circumstances. Well, actually, if the court is going to uphold this dismissal based on the covenant not to pull the 30-month stay. But we can't order them to do that. The FDA is not a party to this lawsuit, but it seems to me this court could, in fact, under its general powers, strongly suggest and perhaps even order that the FDA, because you are finding, for example, that the covenant not to sue, in fact, ended this case, and that the FDA should terminate the 30-month stay. But that's not going to help. I mean, that's not what you're seeking before us. No. That's not what this case is about. Well, it's part of our harm. What I'm really seeking here is the ability to go back to the district court, file my motion for summary judgment, and get a finding of the district court that we do not infringe seven of these patents, and two of them are invalid. Now, what is the dispute now in view of the covenant? What is the dispute between you and the other party? What is the dispute over whether there's been infringement? Is that the issue? Merck has told the FDA that there are certain patents that cover the drug Fosamax, which is the drug at issue here. Nine of those patents, Apotex has looked at and has determined and has notified Merck. Seven of those patents we don't infringe because we use a different ingredient, and the other two patents are invalid. Merck is still blocking us because those patents are listed. And Merck has responded to that by saying, well, we're not going to sue you on any of those nine patents. Well, they've already sued us. They've now dismissed the suit. But the problem is this. In order for us to go to market—and this is the other damage—there is a first to file. And under the statute, the first to file gets a 180-day period during which the FDA will not approve another generic to go to market. The only way that 180-day period begins to run is if that first to file either goes to market and notifies the FDA we've gone to market, or a court—and it's not limited to simply the court that had the first to file's case. So if a second to file, or a third or a fourth like Apotex, goes to a court and gets a decision that it does not infringe those patents or they are invalid, then that 180 days begins to run. Well, that goes to you. Excuse me. You have two others who are in the quay before you for the 180-day exclusivity. Teva? We understand, though no one knows because the FDA is not in a position to tell anyone who the first to file is. But based on what we presume, and I think Burke is taking the same position, Teva and Barr may in fact share first to file and the 180-day exclusivity. However, that 180-day exclusivity begins to run—and I'm going to focus on the second event—when any court, even a court hearing, the third, the fourth, the tenth filers claim that they don't infringe or the patents are invalid. Or the first generic starts manufacturing and selling. Or the first generic manufactures and sells. Now we know because of the way the cases have developed that that earliest date that the first generic can go to market is I believe February 8th or 9th. Apotex's goal was to be able to go to market on that day as well, which it could have done had it been able to file its motion for summary judgment in the district court. Or if it had been the first to file. But it's not. That's a fact of life. But the statute says if you're not the first to file, you have to stay behind the first to file. No, the statute doesn't say that. It doesn't? No, what the statute does say, and the exact quote from the statute is— and this is in the pre-2003 statute, because there was a change made that really doesn't affect much after, but because the first to file fall under the pre-2003 forfeiture provisions, here's what it says, and it doesn't use the word forfeiture. That creeps in in the post-2003 statute. What section are you reading? I'm looking at little 4 of the pre-2003 statute. It says if the application contains a certification— So you're at 5B, little 4. Little 4. If the application contains a certification described in subclause 4 of paragraph 2A, little 7, and that's the paragraph 4 that everyone's talking about, and is for a drug for which a previous application has been submitted, that's your first to file, under the subsection continuing such a certification, the application shall be made effective not earlier, so this is pushing the second, third, tenth filer, then 180 days after, now we come to the critical sections, One, the date the secretary receives notice from the applicant under the previous application of the first commercial marketing of the drug under the previous application, that's what one of the justices just said if they go to market, but here's the critical one, the one that Appetex is still being, or still has an opportunity to utilize, and Congress understood it, or the date of a decision of a court in an action described in clause 3, that's attacking the validity or infringement of the patent, holding the patent which is the subject of the certification to be invalid or not infringed, whichever is earlier, i.e., everyone beyond the first to file. Congress's intent here was to give everyone a shot at killing the patents for either non-infringement or invalidity, and triggering that 180 days early. Even if that first to file, if they haven't gone through the litigation, or they've reached an agreement with the brand and they're not going to market, and they can create a bottleneck, this provision allowed generics further down to break the bottleneck. But if I could bring you back to what the issue in this case is, in the heart of the case, since we're talking about the provision, it says the date of a decision of a court, and this court here held no subject matter jurisdiction because what Congress said was the court is going to decide whether the patent is invalid or not infringed. So the heart of our question, is it not, is to whether or not they had subject matter jurisdiction over this controversy, right? Right. So you agree the controversy between the parties contemplated by Congress was solely the question of whether or not the patent is invalid or not infringed, right? Is that fair? With a written decision, correct. Right. And that's the controversy that was still in front of Judge Sleet, and we believe should still be in front of Judge Sleet until he makes that determination under- Well, what he said is there's no more controversy as to whether or not the patent is invalid or not infringed because we've got a covenant not to sue, so therefore there's no more controversy. But the problem is the covenant not to sue did not eliminate the controversy under Medamine. The controversy is those patents are still blocking us because they're listed in the Orange Book. Apotex is still being directly harmed by Merck's action of those patents being in the Orange Book. And the FDA has said that the words decision of a court here means not just a dismissal. It has to be findings by that court on non-infringement or invalidity. Right, but the court still has to have subject matter jurisdiction over a controversy which we've all just agreed is defined exclusively as to whether or not a patent is invalid or not infringed. So why doesn't a covenant not- And you do agree, do you not, that outside of the context of Hatch-Waxman, a covenant not to sue does move the controversy, right? But it would also- I'm not totally in agreement, and let me point out what the covenant not to sue says because this court has raised, I think, an interesting question. If in their covenant not to sue they had said we agree that the patent is not infringed- Why should they? Why should they, if all they're saying is they're not going to sue, say anything about the validity or infringement of the patent? Because it makes no difference in terms of the controversy. If I want to manufacture something, I'm perfectly happy if someone who holds the patent gives me a covenant not to sue. Forgetting Hatch-Waxman, that gives me full protection. I don't have to also say, well, the covenant not to sue also has to say that they agree I haven't infringed. Well, you may need it if they're going to also go after your customers because if what you're doing is selling a product and your customers are going to be subject to sue and the covenant not to sue does not flow to your customers, you're still being harmed. It might be great that you can make a product, but if you can't sell it, what good is it going to do you? But outside of the Hatch-Waxman situation, if you had a covenant not to sue which would cover everyone, including your customers and everyone else, you would be able to manufacture without any concern. You'd go to market tomorrow. But the problem is we have an artificial act of infringement, because that's what the courts have said Hatch-Waxman creates, with certain requirements. One is generics are allowed to challenge the patents through a DJ action if they're not sued. It is a case in controversy because those patents continue to block, and even Merck recognized it on 8283, which is the last paragraph of their covenant not to sue. It says very clearly, this covenant has no bearing upon the validity or enforceability of any claim, and then it lists the patents in issue. So we're not getting a determination when they simply dismiss. There is still an issue as to whether those patents apply to Apotex's product, i.e., do we infringe, and are those patents valid? And Apotex is denied by Judge Sleek's determination on the covenant not to sue of its right to contest those patents, kill the 30-month stay, and get to market early. But where would your standing be to bring the action at that point? Where is the controversy that still remains? The controversy that still remains is those patents are still blocking us. We're still blocked by our 30-month stay, which automatically went into effect when they sued us. Well, Merck claims that the patents are not blocking, it's the FDA that's blocking. Merck is the one who put those patents in the orange book. The FDA is following what the regulatory requirements are. Merck is taking advantage of that scheme. For example, before Merck even listed those patents, they had to go through and look at their patent portfolio. They had to make the determination of which patents they wanted to submit to the FDA. It's all in the hands of Merck. They're the ones who determine which patents to get. They knew the results. Merck is a well-known pharmaceutical company, and as Judge Sleek noted, he's troubled by what brands are doing. But I'm misunderstanding something here, because I thought, let's assume hypothetically, that the FDA came up tomorrow and said, no 30-month stay under this circumstance. You would still be maintaining, however, that because of the 180-day exclusivity and the ability to trigger that, you still need resolution of your issue, notwithstanding whether or not there's a 30-month stay or not. Am I right about that? Both the 30-month stay and the 180 days are what is impacting. What is the controversy between Apotex and Merck? We need resolution of both. Right, but let's assume there was no 30-month stay issue. Let's assume somebody would particularly— I would still be up here arguing that we should be able to contest the infringement of the patents and the invalidity of the patents, because that 180 days is still keeping us off the market. And if the first generics don't start selling on their first date of February 8th, we're still being kept off the market, because under the old statute, it says, until they even market or there's a decision of the court finding those patents invalid or non-infringed. And a number of these patents are not being contested between Merck and the first of five. Let me ask you one more. Go ahead. Judge—I mean, you started off by lauding—I mean, Judge Sleet, according to you, sort of got it right in terms of what's being gamed in the system, so to speak. He understood what was being gamed in the system. Right, but ultimately his conclusion was, be that as it may, it's not up to a court. It's up to Congress to fix the statute, because the statute is clear. Granted, Congress may—you may be right. This isn't what Congress intended. Congress never contemplated this sort of machination in the process. Conceding all of that, why isn't it still up to Congress to fix it? Because we believe with the Supreme Court's decision in Metamune, this is an appropriate DGA action in Judge Sleet. Error when he found it was not. I don't understand that answer, because if one assumes that what is going on is not what Congress really intended to happen under Hatch-Waxman, why isn't it appropriate for Congress to amend Hatch-Waxman to say that they can bring this suit without regard—and maintain the suit without regard to any covenant not to sue that may be given by the proprietary drug companies? Well, Congress provides for a DGA action to challenge these, and that's in both the old and the new Medicare. But Congress, do you agree that if this thing is not working the way Congress intended, Congress could fix it by amending the statute? What I'm suggesting is Congress doesn't have to. When the Supreme Court says in Metamune, whether the facts alleged under all circumstances show that there is a substantial controversy between parties having adverse legal interests of sufficient immediacy and reality to warrant the issuance of declaratory judgment, this case falls under the Supreme Court's prescription. This is a case that has a substantial controversy. That is, whether those patents are infringed, whether they're valid. The facts are listed in the Orange Book. So you think there's absolutely no doubt that if the Supreme Court tomorrow had to decide a case not involving a license, as was the instance in Metamune, but a covenant not to sue, you have no doubt whatsoever that the Supreme Court would find that the covenant not to sue doesn't eliminate a DGA action? In a Hatch-Waxman situation, I would fully be comfortable that that's what they would do. But not in another situation? I have to go to the Supreme Court. But Metamune didn't deal with Hatch-Waxman. There's nothing in Metamune to suggest that under the rubric of Hatch-Waxman we analyze the injury and the controversy differently. Metamune doesn't deal with that issue, right? Metamune dealt with a license issue, which I think was a very interesting kind of situation. It wasn't Hatch-Waxman, but a license issue. And the prescription they give is applicable to Hatch-Waxman, as it is to license situations. But you're conceding that Metamune doesn't necessarily resolve in the non-Hatch-Waxman situation a covenant not to sue, right? What I responded was I'd have to look at all the facts surrounding the situation to see if Metamune applied. Because as we just discussed, there are a number of situations, even outside the Hatch-Waxman statute, for example, a license situation, where Metamune would clearly apply, even if part of the license was a covenant not to sue as long as you paid the license for it. My position, I think, is quite clear, that this situation with Hatch-Waxman creating the artificial act of infringement, and with the provisions that require court's rulings to trigger certain actions, that simply giving a covenant not to sue doesn't alleviate what Metamune talks about, where it talks about the substantial controversy, parties having an adverse legal interest, of sufficient immediacy, and reality to warrant the issuance of declarations. But is the controversy the fact that you cannot get to market? The controversy is that these patents are in the orange book, that prevents us from getting to market, that we're covered by a 30-month stay. All those are controversies. But let me ask you one thing. In a DJ action, you're not going to have a 30-month stay, right? The 30-month stays don't affect. In your particular case, Merck sued. The only reason there's a 30-month stay issue here is because of a suit by Merck. In the other case we have, as you'll hear later on, we've got a DJ, so I think that there's no 30-month suit. Correct. They're not dealing with a 30-month stay, but they still have the second problem. That is the 180-day exclusivity, and that's why I said there are two problems. You can't simply say... Let me ask you about that. The 180-day problem, isn't that pretty speculative to the extent that you concede that it's a problem if they don't go to market right away, right? If they do go to market right away, then there's no problem. You're not prejudiced in any way, right? Well, there's still a problem as long as... For example, in this case, when it got started, there was more than enough time that had we filed our motion for summary judgment, had we not been dismissed, the 180 days would have started running even before the date they could go to market. And so it was not speculative, and it still isn't speculative, because there's no guarantee they're going to go to market or not go to market. We don't know if there's been a deal cut with Merck. The only way... Well, that's why I'm suggesting it's speculative, because you don't know. Well, but the problem is that the roadblock is still there until the 180 days can be triggered by a court decision. Or a sale by the... Or a sale, right. There's two ways out of this. But there's one that is our controversy, because Merck has filed and put in the orange book those patents. But if they go... Eliminating the 30-month issue, just on the 180 days, if the first to file, whoever it is in this case, goes to market right away and starts the clock running on the 180 days, then this case makes no difference to you all. You're going to be in the same position. It's only the circumstance in which the first to file doesn't trigger the 180 clock right away. But our problem is the 30 months, because... Well, we're back to... I'm sticking to the... But I'm talking about the 180 days. So you are affected by the 180 days, maybe, depending on what the first to file, the first filer does, right? But when the case began, and even today, if we can get a decision, let's say, tomorrow, for example, which we can't do because obviously this court won't look enough to get down and try to sleep... You might be underestimating us. But assuming I'm not... But even if we did, we'd go down and file the motion for summary judgment within 10 days. The goal would be to get a decision to start that 180 days running as soon as possible, because that allows us to go to market earlier. Even if it's one day before February 8th, and we start that 180 days, we can be to market, assuming there's no 30 months out there, in 170 other days, as opposed to 180. If we get everything decided by January, we can be to market 37 days earlier than we would have been had we not. So there's still this controversy, and there are other cases behind us. With or without the 30-month holdup? Well, if we can invalidate the patents and prove non-infringement, the 30 months disappear, because that's part of the statute that says that there's a court decision. So it takes care of itself. Once we get down to Judge Slutty, when we get the ruling we expect to get on a summary judgment within a payment, we kill both the 180 days, or we start 180 days running, and we kill the 30 months. Now hypothetically, if in fact this court reverses and sends it back, does the 30-month stay still remain in effect? It continues from the time of the original filing, or does it start anew? No, it continues from the date of the original filing, because there's the one 30-month stay based on the filing of the lawsuit. And then, once we get a decision, we kill what's left of the 30-month stay, and we start the 180 days. If, hypothetically, we don't reverse, is there a way that you can get a definitive statement by the FDA? How does one adjudicate? I mean, the issue of the 30 months, outside of this case, if this case is affirmed, is still kind of out there. I mean, you have an argument as to why the 30 months shouldn't apply, and they have an argument as to why it should. How does one get that adjudicated?  and I don't want to speak out of turn, there are people who are more expert in administrative procedure than I am, but my understanding would be either a citizen's petition, which could take a long time to decide, or a suit against the FDA, here in the district, challenging the 30-month stay that's been put against us, and taking that through the courts, trying to get them, or a court, to order them to release the 30 months. Perhaps you could sue FDA for a declaratory judgment that the 30-day stay is no longer effective. I don't know, I just... Again, it's something I haven't researched, and I don't think is really the issue in front of this court. That might take longer than 30 months. Yeah, probably a lot longer. Or you could go to Congress. Or you could go to Congress. We've allowed you to run over time. We'll restore you five minutes of rebuttal, and please add some time to Mr. Verzoukis. Give him the same amount of time that we took. Good morning, Your Honors. What I want to start with is that the place we stand in with the case dismissed is Apotex is in no way a worse position than if there had never been a case. Did you get a 30-month stay? We did not get a 30-month stay. And I think there's a very easy way to explain that. The statute provides that if there's a dismissal of the case, for example, including any substantive determination that there's no cause of action for patent infringement or validity... Which section are you reading in the statute? I'm looking at 21 U.S.C. 35J 5B3. And it is our contention that Judge Sleet's opinion is definitely substantive, and he definitely decides that there's no cause of action. No cause of action? Or does that mean that, in effect, the decision on the patents have been made as to infringement or validity? Well, if you look at that, then you wouldn't need the parenthetical, because the statute says if there's a decision as to validity or infringement, it wouldn't apply. And then the parenthetical is added, so it has to mean something more than that. And also, we can look at the way the FDA has applied it. I think apothecaries would not want to actually take the FDA on, because the FDA, indeed, as Judge Friedman suggested, to my awareness, has never applied the 30-month stay in cases where a case was dismissed, far more than actually having a decision as we have from Judge Sleet. And in fact, there's an example that we have in our briefs, and I think the support is in the appendix in pages 903 to 909, where Apotex was involved in an ANDA case against Bristol-Myers on a drug called Zadotor. Bristol-Myers dismissed that case, and the case was dismissed well before the 30-month stay would have expired. And indeed, Apotex came on the market well before the 30-month stay would have actually still been in effect. That's establishing that the 30-month stay was not applied to it, even though Bristol-Myers had filed an ANDA case within the 45 days. Do you know, is there any way now, as of this moment, that you could go to the FDA and say, would you please advise us whether you consider the 30-month stay still in effect in the light of the district court's dismissal of this case? I don't even know that we would have to stand before the FDA to ask it, because to that extent, it doesn't affect Merck. It reflects to the approval of Apotex. When I say you, either party, could your opponent, in effect, ask for some sort of administrative ruling from the FDA? What is the status of this case? I presume they could actually file a citizen's petition and ask the FDA as to what it would do, but we had actually offered them a much better option, because the statute very specifically provides that a court order can shorten the 30-month stay. So you're saying that the 30-month stay was in effect because of your filing within the 45 days? It goes into effect, but based on the practice of the FDA, it appears to not be applied after a case is dismissed. And again, that's the Zavitar example for the Bristol-Myers drug that Apotex came on the market. But when Apotex raised that concern, what we offered them, and as the statute provides, we offered them, if you have that concern, we don't think there's a 30-month stay. But as I understand you correctly, you said the 30-month stay is not in effect because you did not file... Because the case has been dismissed. Well, you filed within the 45 days, so the 30-month stay is automatic. The 30-month stay went into effect upon the filing of the suit. You're exactly right. So it is in effect. It was in effect until the case was dismissed. The FDA does not apply a 30-month stay after a case is dismissed, and the example of that is the case that Apotex had. But you say that. We don't know. The example you give, there may have been other circumstances that we're not familiar with. It seems the most you can fairly say is not that they don't consider it in effect, but they may not consider it in effect. Well, the one example we're able to find, and that again includes Apotex, it was not applied just because there was a lawsuit filed within 45 days. But again, to the extent there was any doubt about that, we offered to Apotex, and as the statute provides for Jess Leak's opinion, that we would both ask and reflect that the 30-month stay would no longer be in effect. And the statute provides that the district court can issue that shortening of the 30-month stay in its order. And Apotex completely ignored that offer, not because it actually, I think, is in any concern about the 30-month stay, but rather because it artificially wants to create... Where is that in the record that you offered that particular aspect of it to Apotex? It is at 851. But right now, as far as the record is concerned, the 30-month stay is still in effect. It would be at 851. And we do not believe it's in effect because the only thing we have to look at is how the FDA has applied it. Again, it's an issue of how the FDA... It's a regulation that is administered by the FDA. And as far as when we looked at how the FDA applies that, it doesn't seem to... Well, I don't understand. In the gray brief, in response to the argument you make in the red brief, your opponent cites the current FDA guidelines. Do you have anything... The FDA has not adopted that parenthetical language, is all that that says. It has not, but it's statutory. The parenthetical language that Congress added is statutory and I think supersedes any regulation of the FDA. But you still have to challenge that regulation if it's in existence at that point in time. Well, one would have to challenge it, I think. One has to look at how the FDA operates. Well, but it's clear, isn't it, that the FDA has never publicly announced that once a case has been dismissed, we will treat the 30-month stay as no longer in effect. That is exactly correct, John. The FDA has never announced that and that's why... And people are drawing various inferences as to the FDA's policy in these matters from what it did in some other cases. And we understand that there's some uncertainty on that and that's why exactly we offered to Appletix the certainty of having JetSleep disposed with any doubt that it may have about the application of the 30-month stay. But that would have also been disposed of if, in fact, there was no infringement of the patents. That would have been disposed of if there was a continual litigation, the case was fully litigated, and if indeed Appletix were able to achieve that result for all nine patents, which is not something we know. Or if in the covenant not to sue, the covenant was premised on a non-infringement basis. If it were premised in order to result in a judgment of non-infringement... No, not a judgment. An agreement. As part of the covenant not to sue, we not only agree not to sue, but we agree that you do not infringe the patents. I'm not sure that that would be the case, because I think there's a decision of court required. I don't think simply by us agreeing to it that would be... But if that's incorporated in the court decision at that point in time in the order, that would be effective to trigger the time period. And again, there's some, there's actually some extensive jurisprudence and some disputes exactly how the FDA applies that, and that is a possibility if that were the case. Hypothetic. Yes. Let me move back to, let's leave aside the 30-month stay and move back to, let's assume that we're dealing with just the 180-day exclusive period. Am I understanding this correctly, that if we were to affirm this judgment, what we're left with as to the system under Hatch-Waxman is that every pharmaceutical, maybe not for the first to file, but at least for others, can wipe out the ability of everyone beyond the first filer to ever get into court to challenge the patents? By entering in a covenant not to sue. Well, it's not the other, are you saying the other generics? The other generics would be precluded. By simply offering up a covenant not to sue to everybody, every potential generic who's out there in the market who has the potential. You would not hold them off the market. You would only hold them off the market for those 180 days during which the first filers have that incentive reward period of 180 days that Congress has. Do you think that's really what Congress, is that the system that Congress set up under Hatch-Waxman to foreclose the other generics down the line beyond the first filer who gets his 180-day exclusivity to preclude those, all of those generics from ever suing and getting an adjudication on infringement or whatever so that they would be eligible to start the clock running? Is that what, I mean, admittedly, that's not what Congress contemplated, right? I think what we have to look at, we have to look, the D.C. Circuit actually looked in a couple of cases at what the intent of Congress would have been in that incentive period. And there, one case, in fact, is an Apotex case and it's Apotex v. FDA that came down in 2006 and it's around Baxley-Leavitt case in which the issue was the 180 days. And in fact, in the Apotex case, Apotex was actually disputing the rule by the FDA that it needed an actual court decision of non-infringement or invalidity in order to trigger another generic's 180 days. And the D.C. Circuit, at least, said Congress was well aware that generics could not get a triggering event if there was no underlying subject matter jurisdiction over a patent case. And that therefore, even though Apotex was referring to that situation as an anomaly, that's clearly what Congress had intended and how it wanted the statute to operate. The idea being that there is a lot of balancing done in the Hatch-Waxman Act and some of that is to encourage the early challenge of patents that generics once made. But Congress actually crafted a specific provision that allows people other than the first filer to trigger the 180 days after the date of a decision of the court. Congress must have contemplated that this might happen or else they wouldn't have addressed that this is a step in the Hatch-Waxman process. Well, I will answer it in the way that the D.C. Circuit did, which is obviously Congress contemplated that such a triggering event would occur if there was no subject matter jurisdiction in an underlying patent infringement action. In other words, that would not be the case if there's no underlying subject matter jurisdiction, which of course is our contention here, just as Judge Sleet found, that there's no underlying subject matter jurisdiction. So how does Congress have to fix it if they wanted to fix it? I think when you say fix it, I'm not sure that they would want the 180 days that acts as an incentive for generics to actually be the first challenger. I'm not sure that Congress would want that to actually be subject to attacks and disappear, because in the end that has the potential of discouraging early challenges. For example... Well, let's assume hypothetically that Congress read Judge Sleet's opinion and said, you know, he's right. This isn't really what Congress contemplated, but it's up to us to change it. I know you don't concede that, but let's assume they did. How would they change it? They could fix it, right? They could change it, right? They would have, in my view, they would have to find a way to actually for there to be an underlying legal dispute and cause of action. But they say, and a decision of this court, subject matter jurisdiction is not foreclosed by a covenant not to sue because there's no real substance or meat to a covenant not to sue when the person isn't even on the market. There could say that, and then there would be a question as to whether that meets constitutional muster. And... You know, I'm not sure that it would. And again, I think this act is actually sufficiently convoluted in so many ways that I think it's impossible. If I could say I could figure a way to fix pieces of it, I think I would probably be the only one in this room who could. Mr. Berzoukas, let me pose a hypothetical to you. Let's assume that Company A owns a very, very profitable coal mine which it mines and sells the coal to the public and it has the exclusive right to mine that coal. Company B comes in and says, hey, that's a pretty good way to make money. And they come on the property and they say to you, I want to mine that coal. You say, no, no, you can't do that because you're trespassing on my property. Right? And... you finally realize that maybe it would behoove you to give them a license to trespass. So they can come on the property and trespass without any consequences, legal consequences, from you. However, they need a permit from the Interior Department to mine the coal. They can't get that coal permit unless they essentially establish a right to be on the property without trespassing or otherwise, but there could be an issue of title to the property. Now, is that the same type of a situation here where Company B would have standing to sue? Company A? Yes, so long as there's an actual dispute, but the dispute is whether or not I can mine that coal. And that coal cannot be mined without the permit from the Interior Department. And that permit cannot be issued unless I establish my right to be on that property. And the only way I can establish that is by suing Company A to bring that action, to establish my right to be on that property. Exclusive of the trespass action. So exclusive of the right to be on the property. Exclusive of the trespass action, which the Company A has agreed they would forego. I would say they would not have an actual jurisdiction in that case. It would not be a legal adverse interest. Because that would mean that Company A would have to give some property right to Company B. It seems to me that just because Company A doesn't want to give some property right to Company B and because the government would require that to be the case. How about clearing title to that property? Would they have standing to sue Company A on that basis? They would, but that would occur despite the fact that there is a right to a potential mining license from the government. Because if there is actually an issue to be resolved with respect to title, that would exist irrespective of the government licensing structure. In Jessica Horst's hypothetical, I take it your answer is there would be no controversy between Company A and Company B in the light of the covenant not to sue over Company B's right to come on the land and get the coal out. There may be a controversy between Company B and the Department of the Interior, whether the Department of Interior would permit them to take the coal out of the land, but that you say is not a controversy between the two parties to the litigation. That is correct, Your Honor. And the way I think of it, and I can think of this in light of one of the recent cases of this court, which is the Benetech-Nucleonics case. In Benetech-Nucleonics, the court recognized, which was another covenant not to sue case, but just not in Yander. But it's not in the Yander sphere. That is correct. But there's a covenant not to sue in which the court recognized that first of all, there had to be, there still has to be an injury in fact, and the injury in fact has to be traceable to the conduct of the declaratory judgment defendant. In this case, I would submit that the actual, to the extent that the 180-day delay is an injury, it's Apotex that's actually responsible for it, because it could have been the first filer, just according like Teva and Barr were, according to the rules that were set up by Congress. They weren't. Now, if we look at what is set up here... But you would agree that if they were in fact the third filer, fourth filer, that the first filer does not need to sell and that 180-day time period would never be triggered, unless they get a judgment on a particular issue. This is the bottleneck argument, and that is nothing but speculation in this case, and in fact, it's I think pretty poor speculation, because both Teva and Barr have issued public press releases and made submissions that indicate they're ready to come on the market in February. There is the full expectation, in fact, Merck has a website, which I think discloses the full expectation that they're going to come on the market in February. But that only covers one of the patents. What about the other patents? With respect to the other patents that Merck has? Right. Unfortunately. Yeah, Merck has dismissed those patents against those generics, and in fact I think Barr... Dismissed them with prejudice? I don't think... I think some of them are dismissed with prejudice. I don't think all of them are dismissed with prejudice, but with respect to these nine patents, there's no intent whatsoever to assert them or try to in any way block them. There's no... I don't think there's any foreseeable circumstance in which we would block them from the market. Is there a dismissal with prejudice that would be triggering a judgment requirement under the statute at that point? I think with respect to some of the nine patents, some of them are dismissed with prejudice. I don't think they're triggering events. But some of them I don't think are dismissed with prejudice. Let me see if I understand in terms of the basic issue in the case, which is whether the district court correctly held it was not a case of controversy sufficient to give jurisdiction. I take it the question is whether the possibility or the likelihood that they will be delayed in getting to market as a result of the various Hatch-Waxman Act provisions in the light of the covenant not to sue, whether that is enough to constitute a case of controversy between the parties for purposes of the Declaratory Judgment Act. Is that a fair statement of what the real issue in the case is? I think that's a fair statement and if I may go back to Benetech v. Nucleonics, this court recognized that Nucleonics actually had an economic interest in invalidating the Benetech patent and the court very well recognized that simply having an economic interest if it's detached from an actual legal adverse position that's justiciable does not give you subject matter jurisdiction in a Declaratory Judgment Act. I think it's easy to look at that by thinking of the following example. The Benetech v. Nucleonics case was dismissed. It's clear that Nucleonics had a financial interest and its investors had a financial interest in invalidating Benetech's patent. If Nucleonics was to go out there and say I'm going to offer a $2 million bounty to anyone who invalidates Benetech's patent. So here we have a prize. The prize for Apotex in this case, they're saying, is their ability to get on the market for those 180 days along with their first filings. So would that mean that even though Nucleonics lacks subject matter jurisdiction, anyone who wants to collect that bounty could come in and say, wait a minute, even though I have no dispute with Benetech as to the infringement of their patent, and Benetech gives me a covenant not to sue, what this does, it takes away the right from me to actually go after that $2 million. I want to trigger my right to collect $2 million from Nucleonics. And it seems to me that that would be a result that is somewhat the tail wagging the dog. But in Benetech though, wasn't it a fact that they could produce at any time based upon the covenant not to sue? There were no restrictions on production at that point. Well, there was no production at all because I think Nucleonics was at a stage at which they were actually doing studies in order to submit data. But it still leaves, I think the fact remains that Nucleonics had a financial and economic interest in the invalidation of the Benetech patent. But Hatch-Waxman is a little different, you would have to agree. There's a designation under the law that there's been infringement, but there's no real infringement. And the covenant not to sue has no meaning, right? I mean, you agree that when Merck offers and gives this unilateral covenant not to sue, there's nothing to it because the person isn't on the market, and indeed, by offering the covenant to sue, if Merck is upheld here, they've essentially precluded the covenant not to sue from ever having any meaning, right? Am I right about that? I think in part you're right, but it also has a meaning in that it means when they're ready to come on the market with every other generic following the Teva and Barr co-exclusivity, the first filer exclusivity, they will not be under any threat that Merck is going to stop their production or stop them from getting to the market. So in that aspect, it does have a meaning. And if you look at the amendments to the Hatch-Waxman Act, that's exactly what patent certainty is. They have patent certainty that they can come to the market with no fear of our patents being asserted against them. If they can come to the market based upon the 30-month delay or the 180-day delay. And again, it's our position that the 30-month stay is not enforced, in fact. And if Appledex had won, it could have made sure of that by incorporating that order in Judge Sleet's order, which we had offered. I think what they're asking... But the action at that point is not up to the determination of the 30-month delay. Isn't it up to the FDA to waive the 30-month delay? Well, actually, the district court judge can order the FDA to shorten the 30-month stay. In the proposal you made, would the district court itself shorten under the statute the 30-day, or would it merely tell the FDA to shorten it? The court can order... The court can actually order a shorter period for the 30-month stay, which the FDA would have to follow. Can I go back to a point you made a few minutes ago about the 180 days? I think you referred to the fact that the first filers had issued some press release that they're going to go on the market right away. Is that what you're... That's correct. As far as I know, there are press releases by both Teva and Barr, which we expect are the two parties that probably share 180-day court solicity, that they're going to come on the market in February of 08. So you're saying that that fact establishes that there's no injury. There's nothing to be gained by the other party here because they are going on the market right away. Well, I'm saying that to the extent they're claiming that there's an aspect of this injury that is this bottleneck that might occur, and it's their burden, by the way, to show that there's injury in subject matter jurisdiction, that there's nothing but complete hypothesis and speculation as to whether Teva and Barr would actually market their product and trigger the period because, you know, even reading their press releases, everything we know is an expectation that they're going to come on the market. So do you agree the reverse would also be true? Let's assume the first filers put out a press release saying that they're going to be delayed and they're not going to trigger it. Would that create sufficient injury for the... I think it would give them another error in their quiver because if that were the case, they could actually claim that this bottleneck may present an injury. I'm not sure that I would still say the case would come out that way. It would give them one more argument that they don't have in this case. If I may, I just want to make one more quick point, which is there's a very simple way, and again, it comes from Benetech, for us to tell whether there's here an underlying legal adverse interest. And if I may just finish this, is it? Go ahead. That there's a legal adverse interest. And the test that's given is would there be a cause of action that the declaratory judgment defendant would have against a declaratory judgment plaintiff were it not for the D.J. action? In other words, how can there be an adverse legal interest if only Apotex can sue us, but we can't sue Apotex? And I think that's an easy way to see that whatever this injury is, it's not caused by Merck, and it's not a dispute between Apotex and the statute, or Apotex and the FDA, or something that Apotex needs to lobby about, but it's not a dispute between Merck and Apotex. Merck does not have a cause of action against Apotex for patent infringement on these patents. We are stopped from doing that. We have given them a covenant not to sue. Quick question. On 851, that's part of your document that was submitted to the court as an offer of settlement? Or is that just one of your memorandums that was submitted? That memorandum was submitted to the court that reflects offers we had made to Apotex. And it was made again in that memorandum to the court, which of course was sent to Apotex, that we would agree to an order by the court to the extent that Apotex had this concern about the 30-month stay, we would agree to an order of the court as is allowed by the statute to shorten that 30-month stay so they wouldn't have any concern about that. But would that be triggered also by the settlement proposal? If it was incorporated in the judge's order? It was not because Apotex never, it was never incorporated because Apotex never responded and never... Would that be sufficient to meet the requirements of the judgment under the statute? I think if the court were to order that, it would meet the requirement of the statute and not be a 30-month stay. It still could not impact the 180-day time period. That is correct. That aspect of it would not impact that. This thing that you're talking about, the district court directing the 30-month stay to be reduced, that's separate and apart from any question of the 180-day stay being abrogated by a judgment. That is correct, Your Honor. That is exactly correct. Any more questions? Thank you. Thank you very much. Mr. Brise, you have five minutes restored of your time. Thank you, Your Honor. First of all, I think as the court noted, the difference between the Benetech case and this case is quite clear, but one of the more interesting aspects, I think, of the Benetech case is the fact that there had been a Supreme Court ruling that made the acts of the accused infringer no longer an infringement, where here it's still an infringement. The filing of the parole therefore is a statutory infringement, so that's a significant difference between the two. The covenant not to sue is simply a decision by Merck that, well, we're not going to chase this any longer. However, Apotex, which is still injured, in its counterclaim specifically asks for its relief that the patents be held to be non-infringed and two of the patents be held to be non-invalid. That's not cured by the covenant. But if the other side is right, let's assume except 30 months goes away, and the first filers do go on the market right away on the 180-day exclusivity, where then is your injury? Our injury is that we could not reduce that 180-day period. Our injury is still there. We can get the Court's decision prior to the beginning of the 180 days, we reduce it. We can drop it down to 179, 160, 150, all the way down. And that's what Congress meant when it allowed anyone to bring that suit and find the patents invalid and non-infringed. That's why in the pre- 2003 Acts there were two bases, one of which was the Court decision, not necessarily by the first of the file, and even in the amendments, there were nine bases for which the 180 days can be forfeited. Congress understood that unfortunately the system could be gamed. I don't think Congress ever anticipated that one would do it with a covenant not to sue. But the Supreme Court, we believe in metamune, takes care of that. Under metamune, this is clearly a case that is subjected to the jurisdiction of a declaratory judgment. But the statement you just made about Congress never contemplating that it could be undermined by a covenant not to sue, isn't that undermined by Senator Kennedy's statement in the legislative history that has been cited in the briefs referencing a covenant not to sue? No, because that statement is made before the FDA made its determination that we need findings of fact and conclusions of law, findings of fact by a Court, finding the patent is not infringed or invalid. Remember, the FDA's decision comes out in 2006. Senator Kennedy's making his statements in 2004 without understanding where the FDA is going to come out on this. And the FDA's determination is we need findings by a Court. And that was the FISA decision that goes up to the D.C. Circuit Court of Appeals and comes back down when the FDA says we need findings by a Court. It's not sufficient. It's clear that nobody expected the FDA to start determining the validity of patents. That's a function of the Court. And that's clearly the FDA's reasoning in that. In other words, Congress has said a finding of non-infringement or invalidity, a simple dismissal would leave the FDA without any direction of a Court on those findings. So it clearly can't be a tolling type event. It can't be a triggering event because there isn't a finding. Mere dismissal doesn't do it. Covenant not to sue doesn't do it. The congressional intent in this statute is to allow the generics to challenge the patents to try and get generics on the market as soon as they can. Merck, by using this covenant not to sue, is attempting to defeat that system. The D.J. action, which is written into the statute and should be allowed in this case, will allow Apotex to go forward and challenge these patents as the statute sets it out. Thank you. Any more questions? Thank you. Case is submitted.